764 A.2d 532

COMMONWEALTH of Pennsylvania, Appellee,

v.

David M. TORRES a/k/a Michael Williams, Appellant.

Commonwealth of Pennsylvania, Appellee,

v.

Elijah Williams a/k/a Bob Torres, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 14, 1999.

Decided Jan. 18, 2001.

88

90

Stephen Begler, Robert E. Stewart, Pittsburgh, for appellant, Elijah Williams.

Kevin G. Sasinoski, Public Defender, Mitchell A. Kaufman, Chief Appellate Div., for appellant, David M. Torres.

Michael W. Streily, Deputy Dist. Atty., for appellee, Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

NIGRO, Justice.

In these consolidated appeals, Appellants contend that the Superior Court improperly reversed the orders of the Court of Common Pleas of Allegheny County granting their respective motions to suppress evidence.[1] Specifically, Appellant David M. Torres a/k/a Michael Williams ("Torres") appeals from the judgment of the Superior Court reversing the order of the Court of Common Pleas of Allegheny County granting his motion to suppress evidence seized, pursuant to a search warrant, from his residence at 5631 Rippey Street, Apartment C–2 in Pittsburgh, Pennsylvania. Appellant Elijah Williams a/k/a Bob Torres ("Williams") appeals from the judgment of the Superior Court reversing the order of the Court of Common Pleas of Allegheny County granting his motion to suppress evidence seized, pursuant to search warrants, from 5631 Rippey Street, Apartment C–5, and 6315 Fifth Avenue and Dennison Street, Apartment 305 in Pittsburgh, Pennsylvania. Because the police used the same affidavit of probable cause to support their applications for warrants to search Apartments C–2 and C–5 at the Rippey Street apartment complex, judicial economy is best served by disposing of Torres and Williams' appeals in conjunction with one another. However, Williams' appeal presents several distinct issues for this Court's consideration. Therefore, we will first consider the

1. Appellants were arrested and charged in connection with a triple homicide in 1996. Although they were initially to be tried jointly, their trials were subsequently severed.

merits of Torres' appeal, and then address the issues presented by Williams' appeal.

### Commonwealth v. Torres

As noted above, Appellant Torres claims that the Superior Court erred in reversing the order of the suppression court granting his motion to suppress the evidence that the police seized from his apartment at the Rippey Street apartment complex. For the reasons that follow, we agree and therefore reverse.

On the evening of February 18, 1996, Timothy Moore, Joel Moore and Robert James were shot to death as they sat inside a parked Ford Bronco on the 1100 block of Sperling Street in Wilkinsburg, Pennsylvania. A police investigation into the murders ensued and three days later Detectives assigned to the Homicide Unit of the Allegheny County Police Department applied for a warrant to search Torres' Rippey Street apartment for firearms, ammunition, records of crack cocaine sales, phone records, pagers and pager numbers, residency papers, crack cocaine and paraphernalia used to package and deliver crack cocaine. In support of their application for the issuance of a search warrant, the Detectives filed the following affidavit:

Your affiants are Detectives assigned to the Homicide Unit of the Allegheny County Police Department. All of the information contained in this affidavit was learned directly by your affiants, or relayed to your affiants by other police officers involved in this investigation.

On the evening of February 18, 1996, the Wilkinsburg Police Department requested investigative assistance from the Allegheny County Police Homicide Unit. This request was in regards [sic] to a recent shooting incident that occurred in the 1100 block of Sperling Street in Wilkinsburg. It was subsequently learned that there were three (3) victims in this case, and all of the shooting victims were pronounced dead at the scene by Emergency Medical Personnel. The victims were all shot while seated in a parked 1982 Ford Bronco. The victims were Timothy A. MOORE,

B/M/25, Joel MOORE, B/M/19, and Robert JAMES, B/M/ 33. The investigation revealed that two armed suspects approached the victim's vehicle, and that the suspects then fired numerous gunshots into the victim's [sic].

During the course of this investigation, it was learned that the three victims were involved in drug related activities. It was also learned that the victims had made a recent drug deal(s) with individuals known to frequent the Wilkinsburg/East Liberty Section of Allegheny County.

Numerous interviews have been conducted in this case. The identity of these witnesses is known to your affiants. These witnesses will be available to testify at any necessary court proceedings. It was collectively learned through these witnesses that several days prior to the shooting incident, Timothy MOORE (victim), made a crack cocaine drug deal with individuals that he knew as "BOB" and "MIKE". Bob and Mike previously indicated that they were brothers, and they were from New York. It was learned that the drug deals in question were set up through the use of telephone pagers. The telephone pager numbers for Bob and Mike were # 574–5647 and # 574–1745 respectively.

It was learned during the investigation that "Bob" had a home telephone number of # 661–4862. This telephone number is listed to a David Michael TORRES of 5631 Rippey Street, Apt. C–2, Pittsburgh, PA 15206. This apartment is located in the East Liberty Section of Pittsburgh. The age of Torres is consistent with the approx. age of "Bob" (as given by various witnesses).

The investigation revealed that on the evening in question, the victims agreed to meet with BOB and MIKE in Wilkinsburg to settle a drug related debt. It was reported that Tim MOORE had previously paid Bob and/or Mike approx. $2,300 for crack cocaine, but that Moore was not given any drugs in return for the money. The victims were to meet Bob and Mike at approx. 8:30 PM (2–18–96) in a parking lot of a Texaco Gas Station in Wilkinsburg. The purpose of the meeting was to resolve the dispute over the aforementioned crack cocaine deal. Witnesses indicated

that the victim's [sic] departed from the New Stanton area of Westmoreland County for Wilkinsburg at approx. 8:00 PM. It should be noted that the planned meeting place for the drug deal was in close proximity to the shooting scene.

During the investigation, your affiants learned through witnesses that the suspects, (BOB/MIKE) lived in the area of Rippey Street in the East Liberty Section of Pittsburgh. [I]t was also learned that Bob and Mike lived with a relative known as "X". The investigation revealed that David MICHAEL TORRES resides at 5631 Rippey Street, Apt. C–2 and that two relatives lived at that same address. These relatives are Robert TORRES, AKA "BOB" Torres, and Xavier TORRES. Robert Torres lives in apartment # C–5, while Xavier resides in apartment B–3.

During a recent surveillance of the apartment building in question, a vehicle was found to be parked in front of the structure. This vehicle had a New York license plates [sic] affixed to it. The description of this car was consistent with the description of the suspect car that was fleeing the shooting scene.

Based on the above facts and circumstances, your affiants respectfully request a Search Warrant for the above listed residence.

The application and affidavit were signed by an issuing authority on February 21, 1996, and the police executed the warrant that same day. The police search of Torres' apartment produced two guns, an undetermined amount of U.S. currency, a box of cartridges, a television, two phones, two remote controls, paraphernalia and various papers bearing the names of Robert Torres and David Torres. Torres was subsequently arrested and charged with three counts of homicide. Torres' counsel filed an Omnibus Pre Trial Motion seeking, *inter alia,* suppression of the evidence seized from Torres' Rippey Street apartment. Following a hearing, the suppression court granted Torres' motion to suppress the evidence seized from his Rippey Street apartment, concluding that the affidavit filed in support of the application for the warrant was insufficient to establish probable cause for the

search. The Commonwealth filed an interlocutory appeal to the Superior Court pursuant to Rule 311(d) of the Pennsylvania Rules of Appellate Procedure [2], and the Superior Court issued a published opinion and order reversing the suppression of the evidence. *Commonwealth v. Torres,* 714 A.2d 416 (Pa.Super.1998). Torres' instant appeal followed.

In reviewing the ruling of the suppression court, we note that the Superior Court was limited to determining whether the record supported that court's factual findings and whether the legal conclusions that the suppression court drew from those facts were correct. *See Commonwealth v. E.M.,* 558 Pa. 16, 735 A.2d 654, 657 (1999) (citing *Commonwealth v. Cortez,* 507 Pa. 529, 532, 491 A.2d 111, 112 (1985)); *Commonwealth v. Waltson,* 555 Pa. 223, 724 A.2d 289, 291 (1998). In addition, the Superior Court was constrained to consider only the evidence presented by the defense and so much of the evidence for the prosecution which remained uncontradicted when read in the context of the record as a whole. *Commonwealth v. Robinson,* 518 Pa. 156, 541 A.2d 1387, 1389 (1988).

In his brief to this Court, Torres argues that the Superior Court ignored the above-cited standard of review, and failed to give proper deference to the suppression court's determination that the affidavit was insufficient to establish probable cause to search his apartment. More specifically, Torres argues that the Superior Court erred by determining that the police corroboration described in the affidavit imparted sufficient reliability to the information given by the anonymous sources [3]

**2.** Rule 311(d) of the Pennsylvania Rules of Appellate Procedure permits the Commonwealth in criminal cases to file interlocutory appeals as of right, so long as it certifies in its notice of appeal that the order being appealed from will either terminate or substantially handicap the prosecution. Pa.R.A.P. 311(d).

**3.** Although the affiants stated in the affidavit of probable cause that they knew the identities of the individuals who provided them with information and that they (i.e., the unnamed tipsters/informants) would be available to testify at any necessary court proceedings, the lower courts properly considered the tipsters/informants to be anonymous sources, since none of them were named, there was no indication that any of them had previously provided information to the police and no reason was given for the failure to divulge their names.

to support a finding that the affidavit established probable cause to search under the "totality of the circumstances" test set forth by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and later adopted by this Court for purposes of making and reviewing probable cause determinations under Article I, Section 8 of the Pennsylvania State Constitution in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1986). The Commonwealth counters by arguing that the Superior Court correctly found that the search warrant was properly issued. According to the Commonwealth, a common-sense reading of the affidavit indicates that some of the individuals who provided the police with information had personal knowledge of the association and conflict between the victims and Torres and that some of them actually observed the commission of the murders. In addition, the Commonwealth contends that the police were able to corroborate enough of the information that they received from their anonymous sources to support the issuing authority's determination that there was probable cause to believe that evidence connecting Torres to the murders would be found in his Rippey Street apartment.

■■■■■ Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in *Gates*, the task of an issuing authority is "simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Gray,* 509 Pa. 476, 484, 503 A.2d 921, 925 (1986)(quoting *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332). Thus, the totality of the circumstances test "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip. . . ." *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Gray*, 509 Pa. at 484, 503 A.2d at 925. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the informa-

tion offered to establish probable cause in a common-sense, non-technical manner. *Commonwealth v. Jones,* 542 Pa. 418, 668 A.2d 114, 117 (1995) (opinion announcing the judgment of the Court).

In the instant case, the suppression court essentially concluded that the affidavit did not provide the issuing authority with a substantial basis to conclude that probable cause existed to search Torres' apartment for evidence linking him to the triple murder that occurred on February 18, 1996. In support of its decision to grant Torres' motion to suppress, the suppression court noted that the affidavit is frustratingly sparse, merely setting forth in narrative form what the affiants learned without providing any clear indication as to where they obtained each of the pieces of information included therein. The suppression court also noted that, based on the four corners of the affidavit, there was no way for the issuing authority to tell how the anonymous sources obtained their information. Accordingly, the suppression court found that the issuing authority had no substantial basis on which to assess the reliability of the information provided to the affiants. Finally, the suppression court found that the only corroboration which imparted any reliability to the information provided by the anonymous sources was the police observation of a vehicle matching a general description of the getaway car used in the shootings outside the apartment complex where Torres lived.[4,5] At the suppression hearing, Detective

**4.** Detective Tallent of the Allegheny County Police Department (who was one of the affiants in the affidavit of probable cause for the search warrant) testified at the suppression hearing that two eyewitnesses described the getaway vehicle used in the murders to the police as a dark colored, four-door vehicle. One of those two witnesses also described the vehicle as mid-sized and possibly black in color. (N.T., 5/5/97, at 42–45.) Detective Tallent further testified that during a subsequent surveillance of the Rippey Street apartment complex, he observed a vehicle with a New York license plate matching the general description of the getaway vehicle given by the eyewitnesses. Detective Tallent explained that he failed to make an effort to detain the vehicle despite his suspicion that it might have been used in the murders because the police surveillance was not specifically for the vehicle, and because limited manpower was deployed to watch the apartment complex. (N.T., 5/5/97, at 45–49 .) However, Detective Tallent did write down the license plate number of the vehicle. (N.T., 5/5/97, at 50.)

**5.** Although the affidavit also indicates that the police verified a phone number, address and general age given for Torres by one or more of the

Tallent, who spotted the vehicle, testified that the vehicle bore a New York State license plate, but also testified that he failed to investigate whether or not the vehicle was connected to Apartment C–2 until after the search of the apartments at the Rippey Street complex had taken place.[6] The suppression court found that this bit of corroboration was insufficient to sustain the warrant in light of the lack of information concerning the basis of knowledge or veracity of the unnamed sources and the failure of the affidavit to ascribe each piece of information to one or several of the anonymous sources.

In reversing the suppression court, the Superior Court found that although the affidavit failed to expressly establish either the basis of knowledge or the veracity of the anonymous sources, the information that they provided to the police was sufficiently bolstered by the following indicia of reliability: (1) the detailed nature of the accounts offered by the anonymous source(s) of the victims' and their assailants' activities leading up to the murders; (2) the police verification of the address and phone number given for Torres; and (3) the police observation of a vehicle matching the description of the getaway vehicle used in the murders outside Torres' apartment complex. *Commonwealth v. Torres*, 714 A.2d 416, 420 (Pa.Su-

anonymous sources, the suppression court refused to consider this corroboration as tending to establish either the veracity of the anonymous sources or the reliability of the information that they provided to the police, since mere knowledge of Torres' listed phone number, address and approximate age does not tend to demonstrate a special familiarity with his personal affairs. *See generally In the Interest of O.A.*, 552 Pa. 666, 717 A.2d 490, 498 (1998) (plurality opinion) (noting that police corroboration of aspects of a tip which demonstrate a special familiarity with the defendant's affairs impart an indicia of reliability to the tip).

6. The police were subsequently unable to connect the vehicle that they observed to Torres' apartment at the Rippey Street complex. (N.T., 5/5/97, at 50.)

per.1998). Thus, the Superior Court determined that the affidavit provided the issuing authority with a substantial basis to support his finding of probable cause to search. As the following discussion indicates, we find that the Superior Court gave too much weight to the indicia of reliability attending the information included in the affidavit and therefore erred in reversing the order of the suppression court.

As acknowledged by the Commonwealth, the affidavit does not expressly set forth the basis of knowledge of the anonymous sources. Nor do we find convincing the Commonwealth's argument that a "common sense" reading of the affidavit clearly indicates that one or more of the anonymous sources had personal knowledge of the events in question or was an actual eyewitness to the murders. Perhaps even more importantly, it is impossible to tell from the affidavit which of the anonymous source(s) provided each of the pieces of information included therein. Therefore, the mere fact that one or more of the anonymous sources provided a somewhat detailed account of the activities of the victims and their assailants preceding the murders does not, in and of itself, constitute a significant indicia of the reliability of that information.[7] In addition, the fact that the police verified the address, phone number and general age given to them for Torres—whose address and phone number were listed in the phone book and were therefore freely available to the public—does not constitute a significant indicia of the reliability of the other information provided to the police by the anonymous sources.

7. We also note that the information provided by the anonymous sources in the instant case is unlike the information provided to the police in *Gates* in one critical respect. In *Gates,* the police were provided with an anonymous note which contained not only a detailed account of the defendants' personal activities in furtherance of their criminal enterprise, but also a prediction of the defendants' future activities relating to their criminal enterprise, which the police independently verified the general accuracy of before seeking the issuance of a search warrant. *Gates,* 462 U.S. at 245–46, 103 S.Ct. 2317. In contrast, the anonymous source(s) cited in the affidavit of probable cause in the instant case offered only a retrospective account of the events leading up to and including the murders, along with the names of and other general information concerning the individuals allegedly involved in the murders.

■ Finally, as noted above, the affidavit mentions that the police observed a vehicle parked outside Torres' apartment complex which met the description of a vehicle seen fleeing the scene of the murders. This piece of corroboration does little to establish the reliability of the information provided by the anonymous sources due to the fact that: (1) the affidavit does not set forth the description of the fleeing vehicle that was given to the police or how the vehicle that was later observed outside Torres' apartment complex matched that description; (2) there is no clear indication in the affidavit as to how the police got a description of the fleeing vehicle in the first place; and (3) although the affidavit explains that the vehicle spotted outside Torres' apartment complex had a New York State license plate (which matched up with the information that the police had received that Torres and Williams had indicated that they were brothers from New York), there is no indication in the affidavit as to whether the police wrote down the license plate number or made any efforts to determine whether the plate could be linked somehow to Torres and/or Williams.

■ Although the basis of knowledge and veracity of anonymous sources are only factors to be considered by the issuing authority in making probable cause determinations, they retain a vital role in cases such as the instant one, where the affidavit of probable cause is almost entirely based on information gleaned from anonymous sources. Where, as here, there is no attempt made to establish either the basis of knowledge of the anonymous sources or their general veracity, a strong showing of the reliability of the information that they have relayed to the police in the specific case is required in order to support a finding of probable cause. Such a showing is simply not made by the affidavit of probable cause in the instant case.[8]

8. While the reliability of information provided by anonymous sources can be established through independent police corroboration, the limited corroboration of general information described in the affidavit of probable cause in the instant case is insufficient to sustain the warrant.

 We are well aware of the fact that, as a reviewing court, we are not to conduct a de novo review of the issuing authority's probable cause determination, but are simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant. *See, e.g., Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). However, even given the substantial deference which we must afford the issuing authority's probable cause determination, we must find that after considering all of the information included in the affidavit and balancing the relative weights of the indicia of reliability (and unreliability) attending that information, the affidavit of probable cause failed to provide a substantial basis upon which to issue a warrant to search Torres' Rippey Street apartment. Therefore, since there is no "good faith exception" to the exclusionary rule in the Commonwealth of Pennsylvania,[9] the suppression court properly granted Torres' motion to suppress the evidence seized from his Rippey Street apartment and the Superior Court erred in reversing it. Accordingly, we reverse the judgment of the Superior Court reversing the suppression court's order granting Torres' motion to suppress the evidence seized from Apartment C–2 at the Rippey Street apartment complex and remand for further proceedings consistent with this opinion.

### Commonwealth v. Williams

As noted above, Williams' appeal presents several distinct issues requiring this Court's consideration. Accordingly, our disposition of Torres' appeal does not necessarily control our disposition of Williams' appeal, despite the fact that a practically identical affidavit of probable cause was used to obtain the warrants to search Apartments C–2 and C–5 at the Rippey Street apartment complex. First, Williams' appeal requires

9. *See, e.g., Commonwealth v. Edmunds*, 526 Pa. 374, 376, 399, 586 A.2d 887, 888, 899 (1991) (concluding that a "good faith" exception to the exclusionary rule in the state of Pennsylvania would frustrate the privacy guarantees embodied in Article I, Section 8 of the Pennsylvania Constitution).

this Court to consider the propriety of the Superior Court's decision reversing the suppression of the evidence found at Apartment C–5 at the Rippey Street Apartment Complex. In addition, Williams' appeal raises a question concerning the propriety of the Superior Court's decision reversing the suppression of the evidence seized from his residence at Apartment 305 at 6315 Fifth Avenue and Dennison Street in Pittsburgh, Pennsylvania. For the reasons that follow, we affirm the judgment of the Superior Court concerning both searches.

Upon executing the warrant to search Apartment C–5 at the Rippey Street apartment complex, the police found a bag of suspected crack cocaine, a scale, plastic bags, scissors, two bags of suspected marijuana, a brown bottle containing an unknown liquid, two bundles of money totaling $2,702.00 in U.S. currency, a broken cellular phone and opened and unopened mail addressed to Williams. Following the searches of the Rippey Street apartments, the police applied for and obtained a warrant to search Williams' residence at 6315 Fifth Avenue and Dennison Street, Apartment 305. Upon executing the warrant, the police found tax records, personal telephone books, prison records, a digital scale, two pagers and numerous plastic bags. Williams was subsequently arrested and charged with three counts of homicide. Williams' counsel filed an Omnibus Pre–Trial Motion seeking, *inter alia*, suppression of the evidence seized from Apartment C–5 at the Rippey Street apartment complex and Apartment 305 at 6315 Fifth Avenue and Dennison Street. Following a hearing, the suppression court granted Williams' motion to suppress the evidence seized from both Apartment C–5 and Apartment 305, concluding that the affidavits filed in support of the applications for the warrants to search the apartments were insufficient to establish probable cause. The Commonwealth subsequently filed an interlocutory appeal to the Superior Court pursuant to Rule 311(d) of the Pennsylvania Rules of Appellate Procedure, and the Superior Court reversed the order of the suppression court by order and memorandum opinion dated June 12, 1998. Williams' instant appeal followed.

On appeal to the Superior Court, the Commonwealth argued that the suppression court erred in finding that Williams had standing to contest the validity of the Rippey Street apartment complex. In the alternative, the Commonwealth argued that the affidavit provided the issuing authority with a substantial basis to conclude warrant to search Apartment C–5 at the that there was probable cause to search the apartment. Although the Superior Court disagreed with the Commonwealth's standing argument, it agreed, in accordance with its prior decision in the companion case of *Commonwealth v. Torres*, 714 A.2d 416 (Pa.Super.1998), that the affidavit established probable cause for the search. Therefore, the Superior Court reversed the order of the suppression court. In accordance with our above disposition of Torres' appeal, we agree with Williams' contention that the Superior Court erred in concluding that the affidavit supplied the issuing authority with a substantial basis to conclude that there was probable cause to search Apartment C–5. However, we affirm the decision of the Superior Court on an alternative basis-that Williams has failed to demonstrate a subjective expectation of privacy in the premises searched. *See, e.g., E.J. McAleer & Co. v. Iceland Products, Inc.*, 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977) (noting that this Court may affirm a lower court's decision on any basis, regardless of the specific basis on which the lower court relied).

 The lower courts concluded that Williams had standing to contest the validity of the warrant to search Apartment C–5 at the Rippey Street apartment complex because he testified at the pre-trial motions hearing that his name was on the lease for the apartment as of the date of the search. The lower courts' legal conclusion in this regard is proper under Pennsylvania law, as the traditional formulation for standing to contest a search based on an alleged violation of privacy rights under Article I, Section 8 of the Pennsylvania Constitution is satisfied when a defendant demonstrates that he has a proprietary or possessory interest in the premises searched.[10] *Commonwealth v. Peterkin*, 511 Pa. 299, 309, 513

10. It should be noted that the "standing doctrine" is no longer relevant to suppression claims based on a violation of the Fourth Amendment to

A.2d 373, 378 (1986). However, having standing based on a proprietary or possessory interest in the premises searched merely entitles a defendant to an adjudication of the merits of his/her suppression motion. *Commonwealth v. Peterson,* 535 Pa. 492, 497–98, 636 A.2d 615, 617–18 (1993). In order to actually prevail on such a motion, the defendant must also separately demonstrate that he had a subjective expectation of privacy in the premises at the time of the search and that such an expectation is objectively reasonable, i.e., that he had a legitimate expectation of privacy. *Id.* at 498, 636 A.2d at 618.[11] In the instant case, the lower courts failed to recognize the legal significance of the fact that Williams, by his own testimony at the pre-trial motions hearing, expressly disavowed having had any subjective expectation of privacy in Apartment C–5 on the date of the search. Williams testified in relevant part as follows at the pre-trial motions hearing during cross-examination:

the federal Constitution. *See, e.g., Minnesota v. Carter,* 525 U.S. 83, 87–88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). However, the United States Supreme Court has also made it clear that a defendant must establish a legitimate expectation of privacy in the premises searched or the item(s) seized in order to be entitled to challenge the search or seizure based on a violation of his Fourth Amendment rights. *Id.*

11. A legitimate expectation of privacy requires "a subjective privacy expectation coupled with objective reasonableness." *Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265, 267, n. 1 (1998) (citing *Commonwealth v. Brundidge,* 533 Pa. 167, 173, 620 A.2d 1115, 1118 (1993)).

Q: Did you control an apartment on Rippey Street?

A: No, I did not. I lived on Rippey Street—you said Rippey. That is one apartment.

Q: The Rippey Gardens.

A: There is one apartment I used to have. That was a long time ago. That is not an updated apartment that I had. I moved to Dennison. That was prior to that. I did not have control over another apartment. I only had one apartment.

Q: You didn't have control over the apartment at Rippey Street, is that what you are telling us?

A: I don't own an apartment on Rippey Street.

Q: Excuse me?

A: I don't own that apartment at Rippey Street. At one point in time, but that was six months prior.

Q: You were still the leaseholder of that apartment, were you not?

A: It was a co-lease.

Q: So you were a co-leaseholder of that apartment on the day of this murder, is that right?

A: I did not own the apartment. I did not live there. Someone else lived there.

Q: Your name was on a lease though, is that correct?

A: Yes, it is because it has to be signed over. It was signed over to another person.

(Pre-trial Motions Hrg. N.T., 9/17/97, at 41–42.)

█ Given this testimony, it is clear that Williams had no subjective expectation of privacy in Apartment C–5 on the date of the search. As noted above, a subjective expectation of privacy in a place or thing, while not a necessary prerequisite for standing to contest a search or seizure under Article I, Section 8 jurisprudence, is essential to a finding of a constitu-

tionally protected, legitimate expectation of privacy. *See, e.g., Hawkins*, 718 A.2d at 267–68. Therefore, having failed to establish that he had a subjective expectation of privacy in the premises as of the date of the search, Williams could not properly prevail on the claim presented in his motion to suppress (which was namely that the police search of Apartment C–5 at the Rippey Street apartment complex violated his right to be free from unreasonable searches and seizures under Article I, Section 8 of the Pennsylvania State Constitution and/or the Fourth Amendment to the Constitution of the United States of America). Thus, albeit on a different basis, we affirm the decision of the Superior Court reversing the suppression of the evidence seized from Apartment C–5.[12]

 Williams also claims in his appeal to this Court that the Superior Court erred in reversing the suppression of the evidence seized from his residence 6315 Fifth Avenue and Dennison Street, Apartment 305. For the reasons that follow, we find that Williams' claim of error is without merit and therefore affirm.

The affidavit of probable cause filed in support of the application for a warrant to search Williams' Dennison Street apartment provided as follows:

> On 2–18–96 three men were shot and killed in Wilkinsburg Pa. The investigation led to a residence at 5631 Rippey St. Pgh. Pa. 15206. A search of three apartments led to discovery of crack cocaine, and firearms and ammunition. One of the weapons matched the bullets removed from the body of the victim (Timothy Moore). One Bobby Torres AKA Elijah "Bobby" Williams was identified as one of the suspects in this case and a[sic] arrest warrant was obtained. On 2–24–96 a call was received from a parole officer stating that Bobby Torres was living at 6315 Fifth Ave. & Dennison St's in Pgh. Pa. The agent stated that he had been to an

12. Williams argues that he had a legitimate expectation of privacy in Apartment C–5 because he, as a co-lessee, had the right to exclude others from entering or remaining inside the apartment. (Appellant's Brief at 17–18.) His argument is misplaced, however, as it does nothing to address his failure to establish a subjective expectation of privacy in the premises as of the date of the search.

apartment at that address and this was the apartment that Torres/Williams informed state parole that he was living in. The agent stated that as of three days ago (Wed.2–22–96) he had interviewed Williams at apartment 305 at the aforementioned address. County and City police went to the residence this date and varified [sic] that Torres/Williams was living at this address with a b/f named Carol Johnson. The suspect and Johnson have resided at this address since 9–1–95. A search warrant is being requested to search the apartment for the above noted items. It is believed that information related to this crime and to the location of others involved may be found in this residence. Since the apart. at Rippey St. was being rented by Bobby Torres/Williams and others associated with him and there was crack and firearms found at that residence it is the belief of your affiants that this is another residence used for drug related activity.

An issuing authority signed the warrant on February 24, 1996, and the police executed it that same day, seizing assorted photographs, papers, letters and tax records, personal telephone books, probation and prison records, a digital scale, personal pagers for Williams, additional telephone pagers, a canister of pepper mace and numerous plastic bags from Williams' Dennison Street apartment.

In granting Williams' pre-trial motion to suppress the evidence seized from his Dennison Street apartment, the suppression court found that the affidavit filed in support of the application for the warrant failed to provide the issuing authority with a substantial basis to find that there was probable cause to search. In support of its determination, the suppression court noted that the affidavit contains "general information and essentially authorizes a fishing expedition." Furthermore, the suppression court found that the affidavit provided an insufficient basis for the issuing authority to conclude that the items sought would be found at the place to be searched. On appeal, the Superior Court reversed, concluding that, based on the totality of the circumstances, the affidavit provided the issuing authority with a substantial basis to find that there was probable cause to believe that evidence tending to

link Williams to the triple murder and/or illegal drug-related activity would be found at his Dennison Street apartment.

While Williams contends on appeal to this Court that the Superior Court erred in reversing the suppression of the evidence found in his Dennison Street apartment, he does not attempt to echo the reasoning of the suppression court in doing so. Instead, Williams argues that if this Court finds that the Superior Court erred in reversing the suppression of the evidence seized from Apartment C–5 at the Rippey Street complex, then, pursuant to the fruit of the poisonous tree doctrine, any references to that evidence in the affidavit of probable cause to search his Dennison Street apartment would also have to be stricken. Without such references, Williams argues that the redacted affidavit would no longer establish probable cause to search his Dennison Street apartment.[13]

Williams' argument is certainly creative. Nevertheless, it is entirely unavailing, as this Court has found that the Superior Court did not err in reversing the suppression of the evidence seized from Apartment C–5 at the Rippey Street Apartment complex. Since Williams' only argument is that the affidavit would be insufficient to establish probable cause if the information obtained from the search of Apartment C–5 at the Rippey Street apartment complex were to be stricken from it, his claim that the Superior Court erred in reversing the suppression of the evidence seized from his Dennison Street apartment must necessarily fail. Accordingly, we affirm the judgment of the Superior Court reversing the order of the suppression court.

Justice CASTILLE and Justice NEWMAN file a concurring and dissenting opinions.

13. In effect, Williams concedes that the success of his appeal from the Superior Court's reversal of the suppression of the evidence seized from his Dennison Street apartment is dependent on the success of his appeal from the Superior Court's reversal of the suppression of the evidence seized from Apartment C–5 at the Rippey Street complex. That being the case, Williams emphasizes that the affidavit of probable cause to search his Dennison Street apartment was based in large part on the evidence that the police previously seized from Apartment C–5 at the Rippey Street complex.

CASTILLE, Justice, concurring and dissenting.

I agree with the majority that, based upon his testimony at the suppression hearing, appellant Elijah Williams a/k/a Bob Torres had no subjective expectation of privacy in Apartment C–5. Therefore, the search of that apartment did not violate Williams' constitutional rights. I also agree with the majority that Williams' derivative challenge to the warrant to search his Dennison Street apartment necessarily fails. Accordingly, I join in the disposition of Williams' appeal.

I disagree, however, with the majority's resolution of the appeal of David M. Torres a/k/a Michael Williams. In disapproving of the warrant to search Apartment C–2, the majority wrongly characterizes the sources of the information provided to the affiants, entirely fails to accord the issuing authority the deference due its decision, and wrongly subjects the warrant affidavit to the sort of hypertechnical, legalistic, hindsight scrutiny that animated the now discarded *Aguilar/Spinelli*[1] review of warrant affidavits. Hence, I dissent in the Torres appeal.

Prior to this discretionary appeal, five judicial authorities reviewed the warrant affidavit here. Four of the five—the issuing authority and the unanimous three-judge panel of the Superior Court—approved it. The lone dissenter was the suppression court judge. I do not dispute that reasonable judicial minds might disagree over the sufficiency of this affidavit, as they might disagree over many, or even most, affidavits. But that is why we must be careful not to overstep our limited standard of review: deferential to the issuing

1. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The *Aguilar/Spinelli* approach required that a warrant "pass two specific tests, under which the issuing authority had to be able to see, on the face of the affidavit of probable cause, both the informant's basis for his knowledge and independent facts showing the reliability of the informant." *Commonwealth v. Gray*, 509 Pa. 476, 481, 503 A.2d 921, 924 (1985). The United States Supreme Court replaced the *Aguilar/Spinelli* test with a totality of the circumstances test in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This Court adopted the *Gates* test for probable cause as a matter of state constitutional law in *Gray*.

authority, looking only to see if there was a substantial basis for the probable cause determination, and viewing the affidavit in a common-sense and non-technical manner.

The majority finds fault with the Superior Court's deferential review because the panel supposedly "gave too much weight to the indicia of reliability attending the information included in the affidavit." Majority Op. at 99. Essential to the majority's analysis is its characterization of the unnamed witnesses who provided that information as "anonymous" "tipsters/informants". Proceeding from that predicate, the majority reasons that, "[w]here, as here, there is no attempt made to establish either the basis of knowledge of the anonymous sources or their general veracity, a strong showing of the reliability of the information that they have relayed to the police in the specific case is required in order to support a finding of probable cause." Majority Op. at 100. I disagree with the majority's suggestion that the issuing authority was required to treat the sources of information here as "anonymous" sources whose information was subject to greater scrutiny for reliability.

The warrant affidavit presented to the issuing authority did not identify the police sources as "anonymous," as "informants," as "confidential informants" or as "tipsters." Instead, it consistently referred to the sources, whom the police interviewed as part of their investigation into this drug-related triple homicide, only as "witnesses." The affidavit went further, relating that the affiants knew the identity of the "witnesses," and that "[t]hese witnesses will be available to testify at any necessary court proceedings." In my view, with our deferential standard of review in mind, the issuing authority was not obliged to ignore what the warrant actually said and question whether the "witnesses" were something other than as described. Instead, the issuing authority was perfectly justified in deeming them to be *witnesses*. These witnesses were decidedly not *anonymous tipsters;* they identified themselves to police. The police simply decided not to name them, a not-surprising circumstance in a case involving witnesses in a drug-related triple homicide.

There is a vast difference between anonymous sources, *i.e.*, sources whose identity is unknown to anyone, such as the author of the letter in *Gates, supra* at 227, 103 S.Ct. 2317, and sources who come forward to police, identify themselves, provide the police with detailed information essential to apprehending murderers and indicate a willingness to testify. The information provided by such witnesses, even if they go unnamed in the affidavit, may properly be deemed reliable precisely because their identity is known to the police and they have expressed a willingness to state in court what they told police. By making themselves known to police, such witnesses expose themselves to serious consequences if they provide false information. The "witnesses" should not be treated in the same way as anonymous tipsters and police informants; their information should not have to be corroborated or their reliability independently established before they may be deemed reliable.

A person willing to stand behind his words and accusations, and to be accountable for them, is obviously more reliable than a person who hides behind a veil of anonymity.

> When ... the underlying source of the police department's information is an anonymous telephone call, the courts have recognized that the tip should be treated with particular suspicion.... As we recently observed ... the anonymous tip may have been a mere prank call. Equally, it may have been based on no more than the caller's unparticularized hunch.

*Commonwealth v. Jackson,* 548 Pa. 484, 490, 698 A.2d 571, 573–74 (1997) (citations omitted). In addition, of course, it is human nature to be more careful and accurate in what one says when there are consequences for misspeaking. It is for these reasons that anonymous tips have been deemed sufficient to establish probable cause only if there is additional evidence establishing the reliability, veracity or basis of knowledge of the tipster, if the information provided by the tipster is corroborated, or if the tip is predictive of the suspect's criminal behavior. *See Gates, supra,* at 242–46, 103 S.Ct. 2317.

Police "informants" likewise are generally considered to be unreliable. As commonly used in law enforcement, an "informant" is not just anyone who provides information to police—*i.e.*, he is not just "any witness." Rather, the police informant is usually from "the underworld or its periphery." *State v. Siegfried*, 274 N.W.2d 113 (Minn.1978). As noted by the Wisconsin Supreme Court:

> Information supplied to officers by the traditional police informer is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject. The nature of these persons and the information which they supply conveys a certain impression of unreliability, and it is proper to demand that some evidence of their credibility and reliability be shown.

*State v. Paszek*, 50 Wis.2d 619, 184 N.W.2d 836, 842 (1971).[2] Police informants differ from anonymous tipsters and concerned citizens in that they often have an ongoing relationship with police. Thus, a police informant's reliability can be established as a result of supplying reliable information in the past. Accordingly, the lack of information concerning the basis of the informant's knowledge is not necessarily fatal to a finding of probable cause. *See Adams v. Williams*, 407 U.S. 143, 146–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also Gates, supra* at 233–34, 103 S.Ct. 2317.

At the other end of the reliability continuum, this Court has acknowledged that the citizen witness who reports a crime is *presumptively* trustworthy. *Commonwealth v. Weidenmoyer*, 518 Pa. 2, 9–10, 539 A.2d 1291, 1295 (1988). This is so because a citizen informer:

> [A]cts with an intent to aid the police in law enforcement because of his concern for society or for his own personal safety. He does not expect any gain or concession in

---

**2.** Notably, however, if the police informant is not part of the criminal underworld, he may be deemed more reliable. *See Jaben v. United States*, 381 U.S. 214, 224, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965) ("unlike narcotics informants, for example, whose credibility may often be suspect, the sources in this tax evasion case are much less likely to produce false or untrustworthy information.").

exchange for his information. An informer of this type usually would not have more than one opportunity to supply information to the police, thereby precluding proof of his reliability by pointing to previous accurate information which he has supplied.

*Id.* at 10, 539 A.2d at 1295 (citations omitted). Thus, "when an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case." *Commonwealth v. Sudler,* 496 Pa. 295, 305, 436 A.2d 1376, 1381 (1981) (*quoting* W. LaFave, Search and Seizure § 3.4(a) at 592 (1978)).

Building upon this recognition, some courts have gone so far as to find that *unnamed* and *unknown* witnesses should be accorded the same presumption of trustworthiness as the citizen witness. In *United States v. Melvin,* 596 F.2d 492 (1st Cir.1979), for example, the United States Court of Appeals for the First Circuit accorded an unnamed witness, whose identity was unknown to the police, greater reliability than the traditional anonymous witness because of the context of the information provided. In *Melvin,* police investigating a tavern explosion secured a warrant to search the home of the defendant. The relevant portion of the affidavit in *Melvin* reported that, "an unknown male stated that a white Cadillac had left the scene moments before the explosion." *Id.* at 494. In upholding the warrant, the court reasoned:

> While the affidavit does not expressly disclose the source of the "unknown male's" information, the nature of the information he provided and the circumstances of this "on the scene" report could strongly suggest to the issuing judge that he was relating what he had personally observed.... [T]he reasonable implication of the affidavit is that the "unknown male" was a bystander witness, not an informant.

*Id.* at 497. Under these circumstances, the information from the "unknown male" deserved a presumption of reliability. *Id.See also People v. Hoffman,* 45 Ill.2d 221, 258 N.E.2d 326, 328 (1970) (holding that "officers ... were justified in relying on the information received from the [unidentified] wom-

an.... [T]he usual requirement of prior reliability which must be met when police act upon 'tips' from professional informers does not apply to information supplied by ordinary citizens.").

Unlike the majority, other courts have recognized that unnamed witnesses who are known to the police do not fall into the same suspect category of witnesses subject to scrutiny for reliability as the anonymous tipster and police informant. *See State v. Cauley*, 863 S.W.2d 411 (Tenn.1993) (key information tying defendants to murder weapons provided by eyewitness whose identity was known to police, but who wished to remain anonymous, properly considered in establishing probable cause); *State v. Cole*, 128 Wash.2d 262, 906 P.2d 925 (1995); *but cf. Commonwealth v. Rojas*, 403 Mass. 483, 531 N.E.2d 255 (1988). The unnamed but known witness is properly treated differently because it is not the disclosure of a witness' name in the affidavit that makes him reliable, but his willingness to identify himself to police and to stand behind his words by testifying. Where information comes from a truly anonymous source, there is no consequence for giving false information. The unnamed but known witness, in contrast, faces consequences, including the prospect of criminal prosecution, for giving false information. *See Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 1378, 146 L.Ed.2d 254 (2000) ("Unlike a tip from a known informant whose reputation can be assessed and *who can be held responsible if her allegations turn out to be fabricated,* 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' ") (citations omitted) (emphasis added).

The issuing authority here was justified in according the known but unnamed witnesses a presumption of reliability. The affidavit, drafted by homicide detectives no doubt well familiar with informants and confidential informants, describes the sources as "witnesses," not as "informants," "tipsters," or "anonymous sources." The plain meaning of the term "witnesses" suggests that they had first-hand knowledge. Furthermore, even though the witnesses were unnamed in the affidavit, their willingness to identify themselves to police and their avowed willingness to testify in a drug-related triple

homicide, is reason enough to credit their information. Indeed, in this fearful day and age, these witnesses perhaps deserve badges of good citizenship for coming forward to aid the authorities in this murder prosecution.

Even if corroboration or further evidence of reliability were necessary, I would find that the warrant here was properly issued. Police confirmed certain aspects of the information supplied by the witnesses, and the credibility of each witness providing that information was enhanced by the information provided by the other witnesses. *See Weidenmoyer, supra* at 10, 539 A.2d at 1295 (witness' statement "is substantiated by the additional sources in the affidavit."). In addition, the affidavit referred to "the description of the suspect car that was fleeing the shooting." This account suggested that at least certain of the witnesses were at or near the scene of the crime, *i.e.*, they saw the fleeing car well enough to describe it. Finally, the witnesses' explanation of the previous interaction between the suspects and the victims, *i.e.*, explaining the drug debt-related motive for the killing, was itself corroborated by the indisputable physical fact of the murders. Multiple homicides are thankfully rare, and even more rarely explainable on their face. The witnesses' ability to explain plausibly why this one occurred suggested the reliability of the citizen sources.

The majority's mischaracterization of the witnesses here, its refusal to defer to the issuing authority's judgment, and its lawyerly, hypertechnical approach will make the task of the police, who conscientiously sought antecedent judicial approval of the search in this case, needlessly more difficult. This Court has already deemed the good faith reliance by police upon judicial approval of a warrant to be irrelevant. *See Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) (rejecting *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) good faith exception to the exclusionary rule). The warrant conscientiously drafted by veteran police officers here satisfied not only the issuing authority, but also a unanimous Superior Court panel. The majority's too-ready willingness to third-guess in such an instance will make police walk an even finer, and often more dangerous line, between

disclosing enough information to survive judicial second- and third-guessing, and withholding enough identifying information to ensure the safety of their sources. The United States Supreme Court's admonition in *Gates* seems particularly appropriate in respect to the homicide investigation here:

> [A]ffidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."

*Gates, supra* at 235, 103 S.Ct. 2317 (citations omitted). Viewed in such a light, the affidavit here is certainly sufficient.

For the foregoing reasons, I dissent from that portion of the majority opinion reversing the judgment of the Superior Court relating to David Torres.

NEWMAN, Justice, concurring and dissenting.

Regarding the resolution by the majority of the appeal of Elijah Williams a/k/a Bob Torres (Williams), I concur. My dissent is with the majority's disposition in the appeal of David M. Torres a/k/a Michael Williams (Torres). I would have affirmed the Superior Court's conclusion that the search warrant affidavit demonstrated probable cause to search Torres' apartment. *See Commonwealth v. Torres*, 714 A.2d 416, 420–421 (Pa.Super.1998). I write separately because I believe that the factual details recited in the affidavit, and the corroboration of those details by the police, sufficiently established the reliability of the unnamed witnesses. Because the affidavit itself illustrated the trustworthiness of the witnesses, there is no need to presume their credibility. Accordingly, the issue of whether an unnamed witness is entitled to a presumption of reliability is best left for another day.