J-S32007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JEAN LUC ARCHER, | |
| Appellee | No. 1154 WDA 2014 |

Appeal from the Suppression Order June 12, 2014
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0000168-2014

BEFORE: SHOGAN, OLSON, and MUSMANNO, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED JULY 08, 2015**

The Commonwealth appeals from the order granting Jean Luc Archer's ("Appellee") pretrial motion to suppress.[1] After careful consideration, we reverse.

The trial court summarized the factual history of this case as follows:

> The Cambria County Drug Task Force arranged a drug transaction on November 26, 2013, involving an undercover task force member, Stacy Burnosky. Detective Burnosky utilized the services of an "unwitting" heroin user, Shawn Varner.
>
> Burnosky asked Varner to buy her [a brick][2] of heroin for $425.00. Varner called his supplier, who was unknown to

---

[1] This Court has jurisdiction over this appeal as an appeal from an interlocutory order as of right pursuant to Pa.R.A.P. 311(d). The Commonwealth has certified in its notice of appeal that the suppression order terminates or substantially handicaps its prosecution of Appellee.

Burnosky throughout the events, but is now known as Herman Edwards. Burnosky drove Varner to [a] McDonald's restaurant in Westmont for the exchange. Edwards called Varner and told him to drive to First Commonwealth Bank in Johnstown. Burnosky, presumably out of Varner's hearing, relayed this information to Detective Arcurio, who was conducting surveillance. In a one-sided cell phone call, overheard by Burnosky, Edwards told Varner to get in a white car parked at the bank with Edwards' cousin ([Appellee]), which Varner did. One to two minutes later, police surrounded the vehicle and arrested Varner and [Appellee]. No drug transaction was viewed. $425 was still in Varner's pocket. A magazine-paper wrapped bundle of suspected controlled substances was found on the driver's seat.

Trial Court Opinion, 6/12/14, at 1-2.

Appellee was charged with one count of criminal conspiracy, one count of possession with intent to deliver ("PWID"), and one count of possession. Appellee filed a pretrial motion to suppress evidence, alleging that he was illegally seized and arrested without reasonable suspicion or probable cause. The trial court granted Appellee's motion to suppress, finding that Appellee's "arrest was premature and at the time the police lacked sufficient reliable and trustworthy information to establish probable cause for a warrantless arrest." Trial Court Opinion, 6/12/14, at 3.

The Commonwealth presents the following issue for our review:

Whether the suppression court erred by holding that the warrantless arrest of [Appellee] was premature and lacked sufficient probable cause when the officers on scene had reasonably trustworthy information which would warrant a

_(Footnote Continued)_ ————————————

[2] Detective Justin Arcurio of the Cambria County Drug Task Force testified that a "brick" of heroin consisted of fifty bags of heroin. N.T., 1/27/14, at 4.

person of reasonable caution in the belief that an offense had been committed by [Appellee].

Commonwealth's Brief at 4.

We begin by noting our well-settled standard of review.

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Carter*, 105 A.3d 765, 768 (Pa. Super. 2014). The finder of fact is free to believe some, all, or none of the evidence presented.

*Commonwealth v. Hartle*, 894 A.2d 800, 804 (Pa. Super. 2006).

In the instant case, the Commonwealth asserts that the proper standard to be used to determine whether probable cause supporting an arrest exists is "one of a totality of circumstances." Commonwealth's Brief at 8. The Commonwealth argues that the suppression court failed to use this standard. *Id.* The Commonwealth maintains that based on the totality of circumstances, the Drug Task Force had reason to believe that Appellee had a "brick" of heroin. *Id.* at 11. As a result, the Commonwealth contends, the detectives had probable cause to arrest Appellee. *Id.*

In determining whether probable cause exists, we have provided the following explanation:

To be lawful, an arrest must be supported by probable cause to believe that a crime has been committed by the person who is to be arrested. A police officer must make a common sense decision whether there is a fair probability that a crime was committed by the suspect. Whether probable cause exists is a highly fact-sensitive inquiry that must be based on the totality of the circumstances as viewed through the eyes of a prudent, reasonable, cautious police officer guided by experience and training. [P]robable cause does not involve certainties, but rather the factual and practical considerations of everyday life on which reasonable and prudent [human beings] act.

*Commonwealth v. Wells*, 916 A.2d 1192, 1195 (Pa. Super. 2007) (internal citations and quotations marks omitted). "[P]robable cause does not require certainty, but rather exists when criminality is one reasonable inference, not necessarily even the most likely inference." *Commonwealth v. Spieler*, 887 A.2d 1271, 1275 (Pa. Super. 2005) (citation omitted). Additionally, our Supreme Court has stated that a determination of probable cause requires only that the totality of the circumstances demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place." *Commonwealth v. Torres*, 764 A.2d 532, 537 (Pa. 2001).

In the case *sub judice*, Detective Burnosky provided the following testimony regarding the drug transaction:

[Detective Burnosky]: What occurred was, I was in contact with a Shawn Varner; contacted him for him to buy me a brick of heroin. He then was able to contact a black male over the phone to meet him somewhere. The first place we were supposed to meet this male was at his residence in Westmont. We then got a phone call to go to McDonald's in Westmont. After that he then contacted the male again, [and he was] advised to go to the First Commonwealth in Johnstown. We then arrived there, and Mr. Varner then called the black male. And I could hear him state, there is [sic] two vehicles pulling in, go to

- 4 -

the second vehicle, my cousin has the heroin. I then handed Mr. Varner the $425, and he then walked to the second vehicle where he was told to go to.

[Counsel]: And you actually heard the voices on the phone say that?

[Detective Burnosky]: Yes.

[Counsel]: The two white vehicles, can you tell the Court where those vehicles were parked in relation to your vehicle?

[Detective Burnosky]: I was parked in the parking lot of the bank. The first white vehicle parked next to me and the second white vehicle parked a little bit further down in the lot. I was still in view of both vehicles.

* * *

[Counsel]: So after you heard this phone call, then what happened?

[Detective Burnosky]: I handed him $425, then Mr. Varner then walked past the first white vehicle and went to the second vehicle.

[Counsel]: And those were official funds?

[Detective Burnosky]: Yes.

[Counsel]: After that, what happened as far as you're concerned?

[Detective Burnosky]: Then when the other officers arrived on scene, the detectives then took the individuals in the second car [into] custody.

N.T., 1/27/14, at 15-16.

Detective Justin Arcurio, a member of the same Drug Task Force, was conducting surveillance during the incident and provided the following testimony:

[Detective Justin Arcurio]: We had an undercover detective [hereinafter "UC"] who was able to buy a quantity of heroin off of a male by the name of Shawn Varner. Mr. Varner and the undercover detective were in a phone conversation with each other several times, and Mr. Varner told the undercover detective to come to his house and meet with him. Mr. Varner said that the brick of heroin, which is 50 bags, would cost $425. So the task force detectives photocopied $425 and handed [it] to the UC. The UC went to Mr. Varner's residence, and Mr. Varner advised the UC that his supplier wanted to meet at the McDonald's in the Westwood Plaza. So the UC and Mr. Varner got into the task force vehicle and drove to McDonald's. When they got to McDonald's, they sat there probably for about maybe 10 or so minutes, give or take a minute.

[Counsel]: Were they under surveillance?

[Detective Justin Arcurio]: Yes. There were other task force detectives following them.

[Counsel]: Did they follow originally to pick him up?

[Detective Justin Arcurio]: Yes. They were following the entire time from leaving the FBI office down to Mr. Varner's house and then from Mr. Varner's house to the McDonald's.

[Counsel]: I apologize. Go ahead.

[Detective Justin Arcurio]: We got to McDonald's. Like I said, we waited for about ten minutes, and I got advised by the UC that the location was going to be changed to the First Commonwealth Bank down in the Eighth Ward by Bishop McCort. So the UC and Mr. Varner left McDonald's and started to drive towards First Commonwealth Bank. As previous, from Mr. Varner's house to McDonald's, they were followed by task force detectives. They didn't make any stops. They drove right from McDonald's to First Commonwealth Bank.

When they got there, myself and Mr. Keirn were in the task force car together doing surveillance. We parked in front of Bishop McCort and had view of the task force vehicle that the UC and Mr. Varner were in. While waiting at the bank, the UC handed Mr. Varner $400 of official funds to purchase the heroin. A short time later two white vehicles entered First

Commonwealth, and at that time the one vehicle parked next to the task force car where the UC and Mr. Varner were located and the other vehicle parked on like the other side of the bank; and Mr. Varner walked away from the task force vehicle and the UC to the white vehicle and got in the front passenger seat.

[Counsel]: Which white vehicle was that?

[Detective Justin Arcurio]: It was the first one. I don't remember the make or model, but it was the one that parked away from them. The first one parked beside them, the second one parked away from them. After about a minute or so myself and other task force detectives approached the vehicle and took Mr. Varner and a black male driver, which was later identified as [Appellee], into custody. Myself, and I believe it was Detective Vince Arcurio, took Mr. Varner out and placed him into custody, and Detective Keirn and I believe Agent Bernard took out [Appellee] and placed him into custody.

I was reading Mr. Varner's **Miranda** warnings the same time Detective Keirn was reading [Appellee's] Miranda warnings. I could hear him. When [Appellee] was taken out of the vehicle, a quantity of heroin was on the seat where he was taken out of.

N.T., 1/27/14, at 4-6.

Furthermore, Shawn Varner provided the following testimony regarding the drug transaction:

[Shawn Varner]: I was at my house [on November 26, 2013] originally. I got picked up.

[Counsel]: Who picked you up?

[Shawn Varner]: The undercover lady.

[Counsel]: Did you know that she was an undercover lady?

[Shawn Varner]: No.

[Counsel]: How did it get arranged for her to pick you up?

[Shawn Varner]: She had called me the day prior and asked if I could get something for her.

[Counsel]: Get something, what does that mean?

[Shawn Varner]: Heroin.

[Counsel]: Did you agree to do that?

[Shawn Varner]: Yes.

[Counsel]: So that would have been on the 25th?

[Shawn Varner]: Yes.

[Counsel]: So on the 26th she comes to pick you up. What happens when she comes to pick you up?

[Shawn Varner]: She picked me up. I received a call and was told to go to McDonald's in Westmont. Left from McDonald's after I got another call and went down to First Commonwealth Bank.

[Counsel]: Who were these calls from?

[Shawn Varner]: Herman Edwards.

[Counsel]: He directed you to go first to McDonald's and then to the bank?

[Shawn Varner]: Yes.

[Counsel]: Did you receive any other calls during that time period?

[Shawn Varner]: No.

[Counsel]: Once you got to the bank, what happened?

[Shawn Varner]: I had gotten out of the vehicle and smoked a cigarette. I was walking to his vehicle, one vehicle that he has, and got in the vehicle with [Appellee].

[Counsel]: So [Appellee] was in the vehicle?

- 8 -

[Shawn Varner]: Yes.

[Counsel]: Was anyone else in the vehicle?

[Shawn Varner]: No.

[Counsel]: Once you got in the vehicle what happened?

[Shawn Varner]: I had the money on me. Within a couple seconds we had got [sic] surrounded and handcuffed and put in the vehicles. Got arrested.

[Counsel]: What were you told about [Appellee] before you got into the vehicle?

[Shawn Varner]: Just that I was supposed to go to that vehicle.

[Counsel]: What was supposed to happen in that vehicle?

[Shawn Varner]: To receive the heroin.

[Counsel]: And who told you that?

[Shawn Varner]: Herman Edwards.

N.T., 1/27/14, at 20-22. Detective Vince Arcurio also testified that he was part of the drug task force conducting surveillance and on the date at issue, saw Varner "walking towards Mr. Edwards' car when he first came into the bank. . . . but I seen [sic] his hand motions, meaning Mr. Edwards, for [Varner] to go to the car behind him, and that's where Varner went." *Id.* at 37-38.

Based on the totality of circumstances, we are constrained to conclude that the officers had probable cause to believe that Appellee was engaged in criminal activity. As stated, Detective Burnosky initiated the request to

purchase a brick of heroin with Shawn Varner. Shawn Varner put into motion events to complete the purchase for Detective Burnosky. For purposes of completing the drug transaction, Detective Burnosky picked Varner up at his house. Varner's supplier first advised Varner and Burnosky to meet the supplier at his residence in Westmont. The supplier then advised Varner and Burnosky to proceed to the McDonald's in Westmont. After a subsequent contact, Burnosky and Varner were advised to proceed to the First Commonwealth Bank in Johnstown. After proceeding to the Bank and entering the parking lot, Varner received a phone call, overheard by Burnosky, directing Varner to "go to the second vehicle, my cousin has the heroin." *Id.* at 15. Burnosky handed Varner the money for the heroin purchase, which Varner took as he proceeded to the second vehicle for the heroin purchase. Once in the vehicle, the officers surrounded the vehicle and arrested Varner and Appellee. Heroin was discovered in the vehicle where Appellee had been sitting.[3]

_____

[3] When describing the heroin as he saw it on Appellee's seat in the car, Detective Thomas Keirn testified as follows:

> [Detective Keirn]: Those are heroin stamped bags in bundles, the rubber bands, and it appears as though there is one that may be opened or may have been opened. But that's what I would consider probably a brick of heroin there, five bundles.

> [Counsel]: So is it clear to you that that's how heroin would be packaged?

*(Footnote Continued Next Page)*

Thus, based on the evidence of record, it is reasonable to conclude that Appellee showed up at the First Commonwealth Bank and engaged Varner in response to Burnosky and Varner's request to purchase heroin. Review of the totality of circumstances results in a reasonable inference that Appellee was involved in criminal drug activity and a fair probability that evidence of criminal activity would be found in Appellee's possession. *Spieler*, 887 A.2d at 1275; *Torres*, 764 A.2d at 537. Indeed, heroin was discovered when the officers detained Appellee. Therefore, the officers had probable cause to detain and arrest Appellee.

The trial court erred in failing to apply the totality of circumstances standard in determining whether the officers had probable cause to detain and arrest Appellee. Moreover, the trial court erred in failing to conclude that the officers had probable cause to arrest Appellee. Consequently, the trial court erred in granting Appellee's pretrial motion to suppress. We therefore reverse the trial court's holding and remand for proceedings consistent with this memorandum.

Order reversed. Case remanded. Jurisdiction relinquished.

_(Footnote Continued)_ ────────────────────

[Detective Keirn]: Yes. I have seen it many, many times.

N.T., 1/27/14, at 42-43.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/8/2015</u>