J-S13005-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| SHARON FLANAGAN, | |
| Appellant | No. 61 WDA 2014 |

Appeal from the Judgment of Sentence Entered December 9, 2013
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0010054-2012

BEFORE:  BENDER, P.J.E., MUNDY, J., and STABILE, J.

MEMORANDUM BY BENDER, P.J.E.:                   **FILED APRIL 06, 2015**

Appellant, Sharon Flanagan, appeals from the life sentence imposed following her conviction for first-degree murder.  She contends that her statements to police should have been suppressed because they were made while she was in police custody, without **Miranda**[1] warnings, and after she repeatedly asked for an attorney.  Appellant also argues that evidence discovered on her computer should have been suppressed because the computer was searched without probable cause.  Finally, Appellant asserts that the evidence was insufficient to support her conviction.  After careful review, we affirm.

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966) (holding that government may not use inculpatory or exculpatory statements made by a defendant during a custodial interrogation unless it demonstrates that the defendant was apprised of her right against self-incrimination and her right to counsel).

The trial court summarized the facts adduced at trial as follows:

The charges arose out of the drowning death of [Appellant]'s two year old son, Steven. [Appellant] checked into Best Western Parkway Inn in Greentree on July 1, 2012[,] with her son, intending to take him to the Sandcastle Waterpark. Approximately two hours later she was seen first in the hallway of her sixth floor room and then in the lobby screaming about "her baby" and clutching her stomach. After a few minutes hotel security realized that she was referring to her child up in her room and they proceeded to the sixth floor. When it was determined that [Appellant] did not have her key, one was obtained from the desk and they gained entry to the room, accompanied by two other hotel guests who had responded to [Appellant]'s cries. One of those guests, Dominick Netti, noticed Steven lying face down in the bathtub, unconscious. He pulled him out and tried to revive him. Steven was dressed in a swim suit and crocs. He was taken by ambulance to Children's Hospital where he died several days later.

[Appellant] told one of the first officers on the scene, Greentree Police Lieutenant Robert Psomas[,] that she had allowed Steven to swim in the tub, filling it to about 10 to 12 inches. She said she was in the room with him the entire time. She saw that he seemed to be having a problem and was beginning to panic. She said that she panicked too and tried to lift him from the water but claimed that she could not; that it felt as if something were holding him down. She left the bathroom to put on a back brace but, when she returned, still could not lift him. She said that she then pulled the plug and ran from the room to get help, eventually making it to the lobby.

[Appellant] told essentially the same story to Allegheny County Homicide Detective Michael Feeney, who spoke with her at Children's Hospital, where Steven had been taken and was then clinging to life. She added that at one point he had been climbing on a towel rack and fell on his back and that he appeared to have his foot caught on something when she was trying to get him out of the tub. She also told Detective Feeney that when she returned after putting on what she described as a back brace, Steven was "lifeless." She said that at this time, she thought that she should drain the tub. She did so and the water began to drain from the tub but the drain became clogged with a wash cloth or a plastic item she said he was playing with. When

- 2 -

the water stopped draining, she told Detective Feeney that she still could not get Steven out of the tub and began to panic. Grabbing her keys and cell phone[, Appellant] ran from the room, stopping to ask a woman in the hallway to call 911 and then proceeding down to the front desk. She later said that she tried to call 911 from the room and, when he checked her cell phone, Detective Feeney noticed that the numbers "9911" were dialed at about 8:32 p.m., around the time of the incident. She agreed to execute a consent to search the hotel room, her car and her cell phone. During this interview, [Appellant] was asked if she wanted to see her son and she declined.

Detective Feeney also secured security video from the hotel. The video shows [Appellant] arriving, carrying Steven in her arms as she walked across the hotel lobby. She appeared to have little difficulty carrying him or lifting him in the video. A latter portion of the video shows her emerging from the elevator at 8:33 p.m. and approach[ing] the front desk.

[Appellant] spoke with detectives again the following day. Allegheny County Detective Stephen Hitchings approached her at the hotel and asked if she would agree to an interview at police headquarters. She said she would. When she entered the police vehicle, she asked if she "needed an attorney." Detective Hitchings told her "no." During the drive to the police station, [Appellant] asked if she "could call a lawyer" and then said she wanted to "call a lawyer." The detective did not tell her that she could not contact an attorney. She was not under arrest at that time and was, according to the detective, free to refuse to answer any questions and to leave, if she wanted.

During this interview[,] [Appellant stated] that earlier that year, between Christmas and March, she believed that her husband may have sexually abused their son. She fled with her son to Akron, Ohio[,] where Steven was examined at Akron Children's Hospital and no signs of abuse were detected. Although she returned home with her son, she and her husband separated and, according to her, the Court gave her husband 70% custody. She had custody the weekend of July 1 and decided to take Steven to Pittsburgh to visit a water park. After checking in, she and Steven watched cartoons until Steven began to get restless. She dressed him in a bathing suit, put water in the tub and sat on the toilet while he played. Detective Hitchings recounted what she told him:

She said during the course of him playing, he's climbing in and out, climbing up on the bar in the tub, and at one point he fell, but she said he was fine and he continued playing, and then during that time she decided to put some of the shampoo that was provided by the hotel into the bath to make it a bubble bath. She said after doing that, she said she discovered him face down in the tub.

…

She stated she attempted to pull Steven from the tub but she was unable to do so, so she went out of the bathroom, got her back brace, came back in and again attempted to pull him from the tub but it felt as if something was pulling him towards the bottom. She stated she then attempted to let the water out of the tub but it seemed like it wasn't going out, so she went and grabbed her keys and her phone, and when she walked out of the room to get help, the door[] shut behind her, and her room key, little credit card key was still inside the room. She went to the front desk and alerted [hotel staff] to get help for him.

At this time, Detective Hitchings determined that it was proper to provide [Appellant] with her pre-interrogation rights. He read those rights to her from the Allegheny County Police Rights Waiver form, [and] had her sign it. It was also signed by the detective and by his partner, Timothy Langani. After [Appellant] executed the form, [D]etective Hitchings asked her several questions. She denied ever threatening to harm her son or that she attempted to drown him in the hotel tub. When asked why she could not pull him from the tub, she responded, "I don't know ... it felt like something was pulling him towards the bottom of the tub."

Trial Court Opinion (TCO), 8/21/2014, at 2-6 (citations and footnote omitted).

The Commonwealth filed a criminal information on August 23, 2013, charging Appellant with criminal homicide, 18 Pa.C.S. 2501(a); aggravated assault, 18 Pa.C.S. § 2701(a)(1); and endangering the welfare of children, 18 Pa.C.S. § 4304(a). Just prior to trial, the Commonwealth withdrew the

charge of aggravated assault. Following a trial conducted on September 16-20, 2013, a jury convicted Appellant of first-degree murder and endangering the welfare of children. On December 9, 2013, the trial court sentenced Appellant to a mandatory term of life imprisonment for first-degree murder, and a consecutive term of 2½-5 years' incarceration for endangering the welfare of children. Appellant filed a timely notice of appeal from the judgment of sentence. Appellant also filed a timely Pa.R.A.P. 1925(b) statement, and the trial court issued its Rule 1925(a) opinion on August 21, 2014.

Appellant now presents the following questions for our review:

I. Should [Appellant]'s statements to police have been suppressed because they were made while in police custody, without the benefit of *Miranda* warnings, after she asked for an attorney?

II. Did the trial court err in failing to suppress the contents of … [A]ppellant's computer as the search warrant to obtain the computer was obtained without probable cause?

III. Was the evidence insufficient to support a finding of First[-]Degree Murder?

Appellant's Brief, at 7.

Appellant's first claim concerns the denial of her suppression motion concerning the statements she made during an interrogation that occurred in the police station on July 2, 2012, the day after the drowning. Appellant argues that her right to counsel was violated when she was questioned during a custodial interrogation, despite having invoked her right to counsel. The trial court agreed that Appellant attempted to invoke her right to

- 5 -

counsel; however, it found that Appellant was not subject to a custodial interrogation at the time when those attempts were made. Consequently, the trial court denied Appellant's motion to suppress her subsequent statements.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*In re D.M.*, 727 A.2d 556, 557 (Pa. 1999) (internal citations omitted).

It is well-settled that:

> The prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel. Thus, *Miranda* warnings are necessary any time a defendant is subject to a custodial interrogation. As the United States Supreme Court explained, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Moreover, in evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances.

*Commonwealth v. Gaul*, 912 A.2d 252, 255 (Pa. 2006) (some internal citations omitted).

"Interrogation" is defined as "questioning initiated by law enforcement officials." *Miranda*, 384 U.S. at 444. In *Innis*, the Supreme Court of the United States elaborated on this subject as follows:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 300-02 (internal footnotes omitted).

The appropriate test for determining whether a situation involves custodial interrogation is as follows:

> The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.
>
> *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa. Super. 1998)[,] *quoting* *Commonwealth v. Rosario*, 438 Pa.Super. 241, 652 A.2d 354, 365–66 (1994) (*en banc*), *appeal denied*,

546 Pa. 668, 685 A.2d 547 (1996) (other citations omitted). Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. **Busch**, 713 A.2d at 101. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring **Miranda** warnings.

**Commonwealth v. Mannion**, 725 A.2d 196, 200 (Pa. Super. 1999) (some internal citations omitted).

Purportedly applying the above standard, the trial court determined that Appellant was not subject to a custodial detention at the time she requested an attorney. Accordingly, the court concluded that Appellant's statements to police were not suppressible under **Miranda**. Specifically, the court found as follows:

Here, Detective Hitchings testified that [Appellant] was under no obligation to go with them; that had she refused to accompany him, she would not have been compelled to do so. If she had asked, during the drive to police headquarters or after they arrived to leave, they would have made arrangements to take her back to her hotel. At all times prior to the decision to have her execute the rights form, she was free to leave. [Appellant] testified at the hearing. She stated that she felt that she needed to go with the officers when they asked her to do so. She did not, however, relate anything the officers said that would cause her to believe that. Moreover, although she stated that at some point during her interview with Detective Hitchings she asked if she could go to lunch and was told no, she did not state when

- 8 -

this occurred. Her testimony was descriptive of the entire time she was in the police station, which she said was between six and seven hours. However, at 1:45 p.m., about an hour and 45 minutes after she arrived, she was advised that she was being taken into custody. At this time, before any further questioning took place, her rights were explained to her and she executed the rights form.

This Court found the testimony of Detective Hitchings to be credible and that testimony established that [Appellant] was not in custody and could not, based on the objective facts, reasonably believed herself to be in custody. Her testimony was self-serving and not credible. She claimed that the rights warning form was presented to her and executed by her "...at the beginning of her time in the interrogation room." The form, however, has the time it was executed written on it: "1345 hours" or 1:45 [p.m.] in non-military time. During her direct examination she was asked by her attorney if she asked for an attorney at any time while she was at the police station. She responded, "I don't remember." A few minutes later, during cross examination, she claimed that she asked for an attorney when she read the form. On the form the word "yes" is provided next to question 6 which asks, "...having these rights in mind, do you wish to speak to me now." She admitted reading and signing the form, but denied at the hearing that she provided the answers.

These inconsistencies, both within her own testimony and with the testimony of the police officers, rendered [Appellant]'s testimony not worthy of belief. The Commonwealth met its burden of establishing that [Appellant]'s statement was properly obtained and, accordingly, the Motion to Suppress those statements was properly denied.

TCO at 8-9.

Appellant contends that she was effectively in custody when she requested an attorney. She points out that when she made the request(s), she was seated in the back of a police car, being transported by police in a city and state unfamiliar to her. Furthermore, although Detective Hitchings testified that Appellant was free to leave at any time during the ride from

- 9 -

the hotel to the police station, Appellant contends that he did not communicate that to her. Moreover, Appellant testified that Detective Hitchings made her feel like she did not have a choice whether to accompany him to the police station.

In addressing Appellant's argument(s), we must first note that we are constrained by the trial court's credibility determinations regarding Appellant's testimony at the suppression hearing. Accordingly, we cannot consider Appellant's actual, subjective belief on appeal regarding whether she felt obligated to accompany Detective Hitchings when it is clear that the trial court found her testimony to that effect not credible, and where it contradicted Detective Hitchings' testimony that he merely requested, rather than ordered, her to go with him. Thus, we must reject any notion that Appellant was transported against her will, at least with respect to the way the transportation was initiated.

Nevertheless, we agree with Appellant that the objective factors which she highlights tend to suggest that she was in custody while in the police car. Police cars do not typically permit exit from the rear, and there is nothing of record to dispute that norm. Moreover, the travel time involved was not insignificant (30 minutes), and because Appellant is not a native of the Pittsburgh area, she would likely have felt uncomfortable getting out of the vehicle in such an unfamiliar setting. Thus, there is at least some evidence that Appellant would not have felt free to abandon the ride despite having initially consented to it. Moreover, Appellant broached the topic of

whether she needed an attorney on multiple occasions, displaying some objective evidence that she believed she was suspected of a crime, and that she was being brought to the police station to answer questions as a suspect, and not merely as a witness to an accident.

However, the trial court was obliged to weigh these factors against other factors that suggested that Appellant was not subject to a custodial detention. For instance, at least initially, Appellant willingly accompanied the police officers to the police station. Appellant was not handcuffed during the ride, or at any time thereafter until she was arrested. And, although Appellant's purse was searched for weapons when she arrived, it was not immediately taken from her, and she was permitted to retain her mobile phone until after she executed a **Miranda** waiver.

Appellant contends that her case compares favorably to **Commonwealth v. McCarthy**, 820 A.2d 757 (Pa. Super. 2003). In that case, the Commonwealth appealed from the trial court's granting of Patricia McCarthy's suppression motion premised upon **Miranda**. A police detective, Wagner, interrogated McCarthy at the school where she worked regarding the theft of a credit card, currency, and prescription medication. The Commonwealth argued that the trial court's decision to suppress McCarthy's statements during that interview was erroneous because she was not in custody when questioned. In affirming the trial court's granting of McCarthy's suppression motion, we relied on the following:

Wagner admitted that his purpose in the return interview was to get [McCarthy] to confess, and that the interview took place in an office with the door closed. Wagner told [McCarthy] she was a suspect, and that he was confident that the handwriting analysis would establish that she was the one who had illegally used the credit card. [McCarthy] testified that Wagner urged her to confess, promising her that if she did, all she would get would be probation and placement in a rehabilitation program. If she did not, she would receive jail time. If she did not confess, he would arrest her and take her out, in handcuffs, in front of all her friends. [McCarthy] asked for permission to call her husband, and to talk [to] an attorney, and Wagner refused. As she told the court: "I stood up, went to the door, and told him, 'Look, I just want to talk to my attorney,' and he told me, no, this is my window of opportunity; if I walked through that door he would make sure that all the charges stuck and he would embarrass me in front of my friends. That's when I sat down."

*McCarthy*, 820 A.2d at 759 (citations omitted).

We note that the procedural posture in *McCarthy* was such that this Court did not face the same credibility issues that were present in this case. Furthermore, *McCarthy* is simply not factually analogous to this case in many respects. At the time McCarthy expressed her desire to speak with an attorney, Wagner was threatening her with arrest and threatening to foreclose upon her rehabilitative opportunities should she be convicted for the theft of the stolen items. Here, despite that Appellant's request for an attorney occurred in a setting more often associated with custodial detentions (the back of a police car versus a school office), the officers did not react to Appellant's request with threats of negative consequences for talking to an attorney. There is also no evidence here that Appellant was in any way thwarted in an attempt to terminate her encounter with police because there is no evidence she made any such attempt. Consequently,

we conclude that *McCarthy* does not provide Appellant with any basis for relief in this matter.

Appellant also cites *Commonwealth v. Zogby*, 689 A.2d 280 (Pa. Super. 1997), for support. Like our decision in *McCarthy*, the *Zogby* Court considered a Commonwealth's appeal from the trial court's granting of a suppression motion on *Miranda* grounds. Furthermore, in *Zogby*,

> Trooper Haubrick entered appellee's bedroom, aroused him from a sound sleep and "advised" or requested him to get dressed and come down stairs to answer some questions. Trooper Haubrick's actions in entering appellee's bedroom, one of the areas of greatest privacy, rousing him from a sound sleep and instructing him to dress and go outside are highly intrusive and suggest a will on the part of the police officer that would not be denied. Appellee was not informed that he could decline the request and, given the degree of intrusion already experienced, it is highly unlikely that appellee believed, or that anyone similarly situated would believe, that he could simply turn over and go back to sleep.

*Zogby*, 689 A.2d at 282-83.

By contrast, in this case, Appellant was not aroused from her slumber in the privacy of her own bedroom, nor is any similar circumstance present. The trial court found credible Detective Hitchings' account that he asked, rather than ordered, Appellant to accompany him to the police station for questioning. Moreover, the request occurred in the lobby of a hotel and in the company of Appellant's husband.[2] *Zogby*'s facts are simply not nearly

_____

[2] Although Appellant's husband was not with her at the time of Steven's drowning, it is undisputed that he was with her when she was approached by Detective Hitchings in the lobby of the hotel the next day.

- 13 -

analogous enough to the instant case to render erroneous the trial court's conclusion that Appellant was not in custody when she inquired about her right to counsel.

Although we recognize that this was a close case on the question at hand, we are unconvinced by Appellant's arguments that the trial court erred in determining that she was not in custody prior to when she executed the *Miranda* waiver. The facts relied upon by the trial court in reaching that conclusion are adequately supported by the record. The court's legal conclusion, which was heavily dependent on those factual determinations, is not clearly erroneous. Accordingly, we conclude that the trial court did not err in denying Appellant's suppression motion based on Appellant's claim that her *Miranda* rights were violated.

Next, Appellant claims that the trial court erred when it denied her motion to suppress the contents of a computer seized during the execution of a warrant. Specifically, Appellant complains:

> Here, [Appellant] was charged with drowning her son in a hotel room bathtub. Nothing in the affidavit [(attached to the warrant)] links that homicide to the items subject to the search. The crime occurred in Allegheny County, not in the vicinity of [Appellant]'s West Virginia home. Any link between this computer and the crime is too tenuous to be anything more than a "fishing expedition" by the police.

Appellant's Brief, at 35.

Our standard of review of this matter is as follows:

> Article I, Section 8 [of the Pennsylvania Constitution] and the Fourth Amendment [to the United States Constitution] each require that search warrants be supported by probable cause.

- 14 -

"The linch-pin that has been developed to determine whether it is appropriate to issue a search warrant is the test of probable cause." ***Commonwealth v. Edmunds***, 526 Pa. 374, 586 A.2d 887, 899 (1991) (quoting ***Commonwealth v. Miller***, 513 Pa. 118, 518 A.2d 1187, 1191 (1986)). "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." ***Commonwealth v. Thomas***, 448 Pa. 42, 292 A.2d 352, 357 (1972).

In ***Illinois v. Gates***, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In ***Commonwealth v. Gray***, 509 Pa. 476, 503 A.2d 921 (1986), this Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, we stated:

> Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in ***Gates***, the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.... It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.
>
> * * *
>
> [Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not

> there is substantial evidence in the record supporting the decision to issue the warrant.
>
> ***Commonwealth v. Torres***, 564 Pa. 86, 764 A.2d 532, 537–38, 540 (2001).
>
> As our United States Supreme Court stated: "A grudging or negative attitude by reviewing courts towards warrants ... is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." ***Gates***, ***supra*** at 236, 103 S.Ct. 2317 (citation and quotation marks omitted); ***see also United States v. Leon***, 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.").

***Commonwealth v. Jones***, 988 A.2d 649, 655-56 (Pa. 2010) (footnote omitted).

In justifying its denial of Appellant's motion to suppress the seized contents of Appellant's computer, the trial court found, and Appellant does not dispute, that the affidavit of probable cause established probable cause that Appellant killed her son. Furthermore, the court determined that the following provisions of the affidavit established probable cause that Appellant had used her laptop computer in connection with what plans she may have had to harm or kill her son:

> h. At approximately 12:30 p.m. on July 27, 2012, Detectives Miller and Towne interviewed [Appellant]'s husband and the victim's father, Steven Flanagan, who stated that in the months prior to the victim's death, [Appellant] displayed strange behaviors, including accusing Mr. Flanagan of child molestation, transferring large sums of money from the couple's joint account to an account in

only her name, dying the two-year-old victim's hair black, and inquiring of Mr. Flanagan whether he had ever contemplated suicide and stating that she would consider taking her son, the victim, with her if she ever committed suicide;

i. Steven Flanagan also told detectives that after the victim's death, he returned to their residence in West Virginia where [Appellant] had been living alone with the victim to find packed boxes and totes that appeared as if [Appellant] was preparing to move and typed notes regarding dying the victim's hair black, information on child abduction, information on school districts in Ohio, job opportunities, and banking information;

j. According to Mr. Flanagan, the residence lacked any type of work processing equipment except for an E Machine laptop computer owned by the couple but within [Appellant]'s possession during the couple's separation;

k. On August 2, 2012, Detective Miller and West Virginia State Police Trooper Edwards executed a search warrant on the residence of Steven Flanagan and [Appellant,] Sharon Flanagan[,] at 260 Topaz Lane in Inwood, West Virginia;

l. Mr. Flanagan relinquished custody of the aforementioned E Machines laptop computer to detectives.

TCO, at 9-10.

We agree with the trial court that, based on Mr. Flanagan's observations of Appellant's behavior, her typed notes, and Appellant's possession of the computer just prior to her son's untimely demise, it was reasonable for the issuing magistrate to believe there was a "fair probability that contraband or evidence of a crime" would be found on Appellant's computer. *Torres*, *supra*. Contrary to Appellant's assertion, this was not a mere 'fishing expedition.' The typed notes discovered by Mr. Flanagan (and their content), Mr. Flanagan's statements concerning Appellant's behavior

prior to the victim's death, and that the couple did not own any other word processing equipment, were sufficiently specific to target Appellant's computer, and common sense would dictate that relevant evidence would be found therein. Thus, Appellant's second claim lacks merit.

Finally, Appellant challenges the sufficiency of the evidence supporting her first-degree murder conviction. Our standard of review of sufficiency claims is well-settled:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

Statutorily, "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). Our Supreme Court has elaborated on this definition as follows:

> There are three elements of first-degree murder: (i) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). As set forth in the third element, first-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. §

2502(a) and (d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." **Commonwealth v. Drumheller**, 570 Pa. 117, 808 A.2d 893, 910 (2002). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. **Commonwealth v. Rivera**, 603 Pa. 340, 983 A.2d 1211, 1220 (2009); **Drumheller**, **supra**; **Commonwealth v. Earnest**, 342 Pa. 544, 21 A.2d 38, 40 (1941) ("Whether the intention to kill and the killing, that is, the premeditation and the fatal act, were within a brief space of time or a long space of time is immaterial if the killing was in fact intentional, willful, deliberate and premeditated."). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. **Houser**, **supra** at 1133–34; **Briggs**, **supra** at 306–07; **Commonwealth v. Wright**, 599 Pa. 270, 961 A.2d 119, 130–31 (2008). Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury. **Commonwealth v. Carroll**, 412 Pa. 525, 194 A.2d 911, 916 (1963).

**Commonwealth v. Jordan**, 65 A.3d 318, 323 (Pa. 2013).

Here, Appellant argues that the Commonwealth's theory of the case, that Appellant "put her baby in the bathtub and held his head under the water until he died[,]" is unsustainable on sufficiency grounds because Steven had no bruises or abrasions that would indicate that a struggle occurred. Appellant's Brief at 38. We disagree.

The testimony of Dr. Karl Williams, Chief Medical Examiner for Allegheny County, belies Appellant's claim. He stated that at least two bruises were found on Steven's body. He identified a bruise on Steven's arm. N.T., 9/16-20/2014, at 273-74. He identified a bruise on Steven's leg. **Id.** at 274-75. Furthermore, Dr. Williams testified that Steven died as a

result of drowning.[3]  *Id.* at 276.  He also determined that the manner of death was homicide.  *Id.* at 280.

With respect to Appellant's specific claim, when asked if there would be "a lot of external trauma" if "an adult is going to force" a 32-pound child under water in a bathtub, Dr. Williams responded:

> Not necessarily, especially in a younger child.  We know in a somewhat younger category where we think of … sudden infant death syndrome, we know you can smother babies without leaving any marks whatsoever.  Again, it is not – I think in your mind you think about adults fighting, struggling, and that might be the case, but, as I say, just forcibly forcing water up into the upper airways is enough to cause the heart to stop.  I don't necessarily expect, especially in a two-year-old to see signs of a struggle.

*Id.* at 280-81.

Dr. Williams elaborated on this point in the following exchange with the prosecutor:

> Q.  If a child is face down in the water and pressure is applied to the back, do you expect to see marks?
>
> A.  No.
>
> Q. Would a child, a 32-pound toddler be able to flail and scratch?
>
> A.  Again, every case is individual, but I don't necessarily expect to find any signs of a struggle.  It all depends if you're forcibly pounding the kid down.  If you are holding someone under the surface of the water that would be sufficient.

_____

[3] Although Steven's heart function was restored through resuscitation, the blood supply to his brain had been cut off for too long, leaving him brain dead.  *Id.* at 276.

Q. If [Appellant] told the detective that the water was up to about her elbow, which would be almost to the top of the tub, that's a fair amount of water; correct?

A. Yes, it is.

Q. Now, … in your expert opinion, … it doesn't take a lot of water to be forced into the mouth or the nose to cause drowning?

A. Again –

Q. Maybe that wasn't very artfully phrased. I think the common thought is you have to ingest a large volume of water.

A. Right.

Q. But that is not –

A. That is not necessarily the case at all, that is true. The circumstances vary widely, but simply the ability to get water injected into the upper airway is enough to have the effect of stopping the heart, stopping respiration.

*Id.* at 281-82.

Based on Dr. Williams' testimony, it was completely plausible that Appellant could have drowned Steven without leaving any physical evidence on his body consistent with a struggle. Thus, the very premise of Appellant's claim, that evidence of a struggle was necessary to prove the manner and/or cause of death, is unfounded.

Moreover, in *Commonwealth v. Meredith*, 490 A.2d 481 (Pa. 1980), our Supreme Court held that:

[W]here an adult is given sole custody of a child of tender years for a period of time, and, during that time the child sustains injuries which may have been caused by a criminal agency, the finder of fact may examine any explanation offered and, if they find that explanation to be wanting, they may reject it and find the person having custody of the child responsible for the wounds.

*Id.* at 482-83.

Applying ***Meredith***, the trial court explains:

[Appellant's] testimony that she was present when her son drowned also is sufficient to support the jury's conclusion that she caused his death. Her explanation that she was unable to lift her child from the bathtub is simply not worthy of belief. The video tape of her entering the hotel and registering shows her carrying Steven and lifting him without any difficulty whatsoever. [Appellant]'s trial testimony was glaringly different than what she told the officers each time she was interviewed on the day of and the day after the events at the hotel. During her statements to police, she indicated that she never left the bathroom and was sitting on the toilet seat with Steven the entire time. At trial, however, her story changed dramatically. She stated that she was distracted and out of the bathroom when she realized that she could not hear him playing anymore. She said that she went in and at that time, found him face down in the tub. She explained at trial, however, that her statements to the police officers were lies to cover up her inattentiveness because she was afraid that she would lose custody of Steven if it was determined that she had neglected Steven and allowed this to happen.

The Commonwealth also presented evidence showing various internet searches that [Appellant] conducted in the days and weeks leading up to her son's death. She read stories about Casey Anthony, the women accused of murdering her child, who claimed that at trial, that her father had molested the baby. As it is well known, Ms. Anthony was acquitted. She also did research on the internet what was the leading cause of the death of toddlers.

The facts presented to the jury were that this child was in the sole care and custody of his mother when he died. How that occurred was the key question at trial and obviously the Commonwealth only had circumstantial evidence to try to establish that what occurred constituted first[-]degree murder. The circumstantial evidence outlined above consisting of [Appellant]'s conduct before the incident at the hotel, her incredible description of how the death [occurred] in her interviews with the police, and then her completely contradictory testimony at trial provided the jury with sufficient evidence to

- 22 -

conclude that the death of Steven was intentional and at the hands of his mother.

TCO, 12-13 (citations omitted).

We agree with the trial court. The circumstantial nature of the evidence against Appellant did not impede the result reached by the jury in this case. *See Commonwealth v. Hardcastle*, 546 A.2d 1101, 1107-08 (Pa. 1988) ("There is no requirement that a homicide, including murder in the first degree, be proven by eyewitness testimony. Circumstantial evidence may be sufficient to prove any element, or all of the elements of the crime."); *Commonwealth v. Wentzel*, 61 A.2d 309, 312 (Pa. 1948) ("Circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence; in the concrete, it may be infinitely stronger."). Furthermore, pursuant to *Meredith*, the jury was permitted to reject Appellant's inconsistent and, frankly, unbelievable explanations regarding her son's death, and find instead that Appellant had drowned him. Finally, Appellant's internet searches conducted prior to Steven's death, regarding the Casey Anthony case and the leading causes of death for toddlers, provided adequate circumstantial evidence of Appellant's premeditation, deliberation, and malice.[4] As such, we conclude that Appellant's sufficiency of the evidence claim lacks merit.

---

[4] Although this Court has not found any Pennsylvania cases directly on point, we recognize that this circumstantial evidence is probative of Appellant's *mens rea* for first-degree murder. In this regard, we find instructive our sister Commonwealth's decision in *Commonwealth v. Carey*, 974 N.E.2d
*(Footnote Continued Next Page)*

Judgment of sentence **affirmed**.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/6/2015

_(Footnote Continued)_ ————————

624, 633 (Mass. 2012). In that case, the appellant contested the admission of the following evidence in his trial for the attempted murder of the victim by strangulation:

> [E]ight photographs and [a] ninety-second video depicting women in various states of undress being strangled, ostensibly to death; [an] [i]nternet article regarding the successful appeal of a man convicted of four strangulation murders; and testimony regarding the number of explicit images and Internet searches found on the defendant's home computer.

**Id.** at 632.

The High Court of Massachusetts held that the "images, and the testimony regarding the additional images and searches related to strangulation and asphyxiation stored on the [appellant]'s computer, were sufficiently similar to the way in which the [appellant] assaulted the victim to be relevant to and probative of his sexual desire and state of mind." **Id.** at 633. Similarly, Appellant's inquiries into the leading causes of death for toddlers, and her research into the Casey Anthony case, provided evidence, albeit circumstantial, regarding Appellant's premeditation so as to support the jury's conclusion regarding the malice/intent-to-kill element of first-degree murder.